IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2012 DEC 13 A 8: 29

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| DEMETRIUS NEWTON, ALABAMA DEMOCRATIC CONFERENCE, FRAMON WEAVER, SR., STACEY STALLWORTH, ROSA TOUSSAINT and LYNN PETTWAY )<br><br>Plaintiffs,<br><br>vs.<br><br>STATE OF ALABAMA, ROBERT J. BENTLEY, in his official capacity as Governor of Alabama and BETH CHAPMAN, in her official capacity as Alabama Secretary of State,<br><br>Defendants. | Case No. 2:12-CV-1081<br><br>(Three-Judge Court Requested) |

## COMPLAINT

For their complaint in the above-styled action, Plaintiffs Demetrius Newton, Alabama

Democratic Conference, Stacey Stallworth, Framon Weaver, Sr., Rosa Toussaint, and Lynn Pettway,

state as follows:

## INTRODUCTION

1.      This action challenges Act No. 2012-602, which redistricts the Alabama House of

Representatives, and Act No. 2012-603, which redistricts the Alabama Senate under Section 2 of the

Voting Rights Act, 42 U.S.C. 1973, and the Fourteenth and Fifteenth Amendments of the United

States Constitution. Said Acts would result in discrimination against black and other minority voters

on account of their race or membership in a language minority group and they were adopted with a

racially discriminatory purpose. The Acts constitute racial gerrymandering in violation of the

Fourteenth and Fifteenth Amendments of the U.S. Constitution and continues practices of racial


SCANNED

discrimination condemned by the U.S. Supreme Court in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

## PARTIES

2.      Plaintiff Demetrius Newton is an adult African American citizen of the United States of America (hereinafter "U.S.") and the State of Alabama. Plaintiff Newton is a registered voter in Jefferson County, Alabama who votes in the former House District 53. Plaintiff Newton is the state house representative of former House District 53.

3.      Alabama Democratic Conference (hereinafter "ADC") is a statewide political caucus formed in 1960. It has members in almost every county in the State of Alabama, including each county involved in this action. The purpose of ADC is to endorse candidates for political office who will be responsive to the needs of the blacks, other minorities and poor people in the State of Alabama. ADC's purpose is also to protect the voting rights of racial minorities in the State of Alabama. ADC worked closely with the Alabama legislative committee to redraw the state senatorial and representative districts in 1980, 1990 and 2000 for the State of Alabama. ADC attempted to participate in that process in 2010.

4.      Plaintiff Framon Weaver, Sr. is an adult Native American citizen of the U.S. and the State of Alabama. Plaintiff Weaver is a registered voter in Washington County, Alabama, who votes in the former Senate District 22.

5.      Plaintiff Stacey Stallworth is an adult African American citizen of the U.S. and the State of Alabama. Plaintiff Stallworth is a registered voter in Montgomery County, Alabama, who votes in the former House District 73.

2

6.     Rosa Toussaint is an adult, Hispanic citizen of the U.S. and the State of Alabama. Plaintiff Rosa Toussaint is a registered voter in Madison County, Alabama, who votes and lives within the area of a potential minority, coalition and/or crossover senate district which, for a racially discriminatory purpose, the Legislature failed to adopt.

7.     Plaintiff Lynn Pettway is an adult African American citizen of the U.S. and the State of Alabama. Plaintiff Pettway is a registered voter in Montgomery County, Alabama, who votes in the former House District 73.

8.     Defendant State of Alabama is one of the states of the United States of America and is subject to the Voting Rights Act and the Constitution of the United States. Defendant Robert J. Bentley is sued in his official capacity as Governor of the State of Alabama. As Governor, he is the chief executive officer responsible for executing the laws of the State of Alabama. Defendant Mary Beth Chapman (hereinafter referred to as "Defendant Chapman") is sued in her official capacity as Secretary of State of Alabama. In that capacity, Defendant Chapman is the chief elections official in the State of Alabama and is the official with authority and responsibility to certify the election of members of the Alabama Legislature.

## JURISDICTION

9.     This case is brought pursuant to 42 U.S.C. §1983, 42 U.S.C. §1973, and the Fourteenth and Fifteenth Amendments of the Constitution of the United States of America. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1357, 2201, 2202, and 2284.

10.     A three-judge District Court panel must be convened pursuant to 28 U.S.C. § 2284 in that this action challenges the constitutionality of the apportionment of a statewide legislative

body.

## VENUE

11.     Venue of this action is proper in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b).

## FACTS

12.     On May 31, 2012, the Defendant Governor Bentley signed into law Acts 2012-602 and 2012-603. Act 2012-602 redrew the Alabama House of Representatives districts and Act 2012-603 redrew the Alabama Senate districts pursuant to 2010 census data. Plaintiffs contend that said Acts, as passed, were for the purpose of gerrymandering voting districts by the dilution, packing and artificial capping of black or other minority voting strength in order that they would result in discrimination against black and other minority voters of the State of Alabama. The Acts unnecessarily maximize or pack majority-black or other minority voting-age population into voting districts and segregate and fragment African American or other minority voting strength.

13.     According to the 2010 Census, the population of the State of Alabama was 4,779,736 persons, of whom 3,204,402 (67.0%)were white non-Hispanic persons, 1,251,311 (26.2%) were black persons, and 253,031 (5.9 %) were members of other races or identified themselves as being of more than one race. Hispanic persons who may be of any race comprised 3.9% of the population.

14.     The Alabama House of Representatives consists of 105 members elected from single-member districts. The Alabama Senate consists of 35 members elected from single-member districts.

15.     The proposed redistricting plans provide for 26 House districts (24.8 %) and eight Senate districts (22.9%) in which eligible black voters (i.e., those not incarcerated in facilities of the

4

Alabama Department of Corrections) comprise a majority of the voting age population. The population of and the racially polarized voting patterns in the remaining House districts (79 or 75.3%) and Senate districts (27 or 77%) are such that minority voters will be frozen out of opportunities for electoral influence beyond the quota of seats designated for them by the Legislature.

16.   The House and Senate redistricting plans provide for substantial over-representation of white persons and under-representation of black and other minority persons.

17.   Minority population in Alabama is concentrated so that black citizens and/or minorities generally could constitute majorities in additional areas of the State. The House and Senate redistricting plans, however, fragment or pack black and other minority populations so as to avoid creating districts in which black or other minority voters could elect candidates of their choice to the Legislature. Such areas include, but are not limited to, Jefferson and Montgomery Counties in the House plan and Madison County in the Senate plan. Minority population in Alabama also is concentrated so that black persons have been able, in coalition with other groups, to exert decisive influence over legislative elections; and the plans fragment areas in which black have formed crossover districts in which dependable coalitions elect candidates who are the choice of minority voters.

18.   Elections in Alabama are characterized by racial bloc voting in that there is a consistent relationship between the race of the voter and the way in which the voter votes. Black voters usually provide very large majorities to candidates whom they support and white voters usually cast very large majorities in opposition to the candidates supported by black voters.

19.   Black citizens of Alabama continue to bear the effects of the state's long, pervasive and persistent history of discrimination. Black citizens suffer from disparities in such areas as

income, education, employment and health that affect their ability to participate in the political process.

20.     White officials of the State of Alabama have acted and continue to act intentionally to deter participation by black citizens and to disrupt and hamper black political organization.

21.     Racial discrimination in voting and other areas has extended in recent years to other minorities, including Hispanic, Native American and Asian citizens of Alabama, as those groups have become more numerous and visible.

22.     The State of Alabama has a long history of discrimination against black voters, and the history of the adoption of the House and Senate redistricting plans continues a series of actions taken with a racially discriminatory purpose.

23.     Hundreds of state and local voting practices have been enjoined by the federal courts as racially discriminatory. United States Attorneys General have entered Section 5 objections to Alabama and its political subdivisions regarding its voting laws over a hundred times.  Alabama elections have been marked by mistreatment and intimidation of black citizens, and Attorneys General have assigned federal observers to monitor over 185 Alabama elections, including recent elections in 2006, 2008, 2010 and 2012.  Each instance of assignment of federal observers required a finding by the Attorney General that such observers were necessary in order to enforce the guarantees of the Fourteenth and Fifteenth Amendments.

24.     After passage of the Voting Rights Act and after years of enforcement of its salutary provisions the Alabama Legislature enjoyed a period in which black voters and their representatives enjoyed some influence in the Alabama Legislature and were in a position, from time to time, to pull, haul and trade to obtain advances for all citizens.  In 2010, however, an all-white group of legislators

6

hostile to the electoral aspirations of black or other minority voters of Alabama gained control of both houses of the Alabama Legislature and the Governor's office. In the 2010 statewide elections, this white group won filibuster-proof majorities in both the House of Representatives and the Senate of the Alabama Legislature and proceeded systematically to undermine and minimize the influence, effectiveness and participation of black voters in Alabama, and to eliminate any effective opportunity to pull, haul and trade to achieve their legislative goals.

25. A rare glimpse into the attitudes and motives of the dominant all-white faction of the Legislature comes from tape recordings of white legislators who wore recording devices as part of a federal investigation of public corruption. In addition to investigation-related conversations, white legislators inadvertently recorded conversations with their white allies. In *United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011), the Court made detailed factual findings respecting two key witnesses, State Senate Rules Committee Chair Scott Beason and State Representative Benjamin Lewis. The Court found that both men lacked credibility for two reasons. First, the motive for cooperating with the FBI investigators was not to clean up corruption but to increase their political fortunes by reducing African American voter turn out. Second, the Court found that they lacked credibility because the record established their purpose was racially motivated.

26. Beason and Lewis and their allies, sought to defeat a proposed constitutional amendment on gaming which would require a statewide referendum partly because they believed that if the gambling referendum were not on the ballot it would lower African American turn-out in the 2010 elections. Both Beason and Lewis made racially derogatory remarks. The remarks were made while Beason and Lewis were discussing political strategy with other influential white legislative

7

allies. The Court found that these remarks reflected a racist animus toward African American citizens of Alabama. The Court also found that the remarks reflected a racial animus toward Native American citizens who, in Alabama, tend to be concentrated within the area of "old" (Senate Plan adopted in 2001, or pre-Act No. 2012-602) Senate district 22 (Keahy).

27.     The Court specifically found that these white legislators in the dominant faction "singled out African Americans for mockery and racist abuse. . . Beason's and Lewis' statements demonstrate a deep seeded racial animus and a desire to repress black votes by manipulating what issues appeared on the 2010 ballot. The Beason and Lewis recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this state." *Id.* at 1345-1348.

28.     None of the other white leaders involved in these and other recorded calls made any objection or other comment regarding the racist comments of Beason and Lewis. In response to the public release of the tape recordings there was deafening silence from the leadership of the all-white dominant Legislative faction. The comments by Beason and Lewis were made public in February 2011, but in June 2011, the State Republican Chair was still defending Beason. Beason did not offer any public apology for his comments until September 27, 2011, and even then, and in the face of widespread criticism and condemnation of Beason and Lewis (now appointed to a state court judgeship), Senate President Pro Tem, Del Marsh, allowed Beason "the benefit of the doubt" and allowed Beason to retain his powerful Rules Committee Chairmanship. Sen. Marsh did not remove Beason as Rules Committee Chair until November 15, 2011.

29.     As their lack of critical comments and the indifference of the white legislative leadership to the comments show, the racist opposition to black political participation on the part of

the dominant all-white faction of the Legislature is not limited to the election of black members of the Legislature. The racial animus extends to opposition to equal black political participation in referenda such as the gaming referendum and the right of black citizens to form coalitions and to enjoy an opportunity to pull, haul and trade in the political process as equal citizens of Alabama and the United States.

30. Senator Beason also figured prominently in another contemporaneous racial action in the Legislature. He was the principal author and co-sponsor of the State's notorious anti-immigration legislation, much of which was voided as unconstitutional. Senator Beason made statements that the Legislature was motivated in part by a concern that "when their children grow up and get a chance to vote, they vote for Democrats."

31. In 2010, there was no gambling referendum on the 2010 ballot and the elections placed firm control of the Alabama Legislature in the hands of Senator Beason and his confederates. The newly elected legislators were sworn in on the heels of the election in November of 2010, and outgoing Republican Governor Riley promptly called a special session purportedly designed, like the anti-gambling efforts, to stop corruption, but more directly aimed at suppressing black political participation. Act 2010-764 placed a ban on transfers between political action committees and 527 organizations (PAC to PAC transfers). The intended effect of the ban on PAC to PAC transfers, until it was enjoined as unconstitutional in *ADC v. Strange*, No.5: 11-Cv.02449-JEO (M.D. Ala. December 14, 2011), was to block funding for black "Get Out the Vote" activities such as the those regularly performed by the Alabama Democratic Conference, Alabama New South Coalition and other black political organizations. Although the stated goal was to block corruption in campaign spending, the Legislature continued to allow unlimited contributions directly to candidates from

9

individuals and corporations that the United States Supreme Court repeatedly has held is the only form of campaign spending that creates corruption. *Buckley v. Valeo*, 424 U.S. 1 (1976); *Citizens United v. Federal Election Commission*, 558 U.S. 50 (2010).

32.     The November 2010 special session also produced another law that has since been enjoined as unconstitutional, Act No. 2010-761. This law placed a ban on payroll deductions for public employees or any organization that engages or has engaged at least once in political activity. The Act was aimed openly and squarely at public employee unions and most especially with what the Alabama Republican Party has called the "radically liberal . . . anti-religious, anti-American Alabama Education Association." The AEA, is the product of a merger in 1969 between formerly all-white AEA and all black Alabama State Teachers Association (ASTA) which then, as now, "was viewed as a liberal, pro-black lobby." *Knight v. Alabama*, 458 F. Supp. 2d. 1273, 1295 (M.D. Ala. 2004).

33.     The Legislature, before adopting the reapportionment plans contained in Act Nos. 2012-602 and 2012-603, adopted redistricting standards that guaranteed the House and Senate plans would violate the Alabama Constitution. In addition to the written standards, Senate President Pro Tem, Del Marsh, openly stated his intent that all-white majority Senate districts should elect members favorable to the all-white faction, cementing its control of the Legislature and institutionalizing the minimization of black political strength.

34.     In adopting the redistricting plans, the Legislature departed from previous legislative standards and from considerations normally considered important by the decision-maker. The Legislature departed from uniform past practice and adopted as a standard that the district population deviations could not exceed ± 1%, or 2% total rather than the legally permissible + 5%, or 10% total

10

deviation range used by most states and used uniformly by the State of Alabama in legislative redistricting since the early 1970s.

35.     The Legislature adopted this standard in order to effectuate a plan to pack black voting districts, fragment black voting districts, dilute black voting districts, and cap black representation and influence.

36.     The adoption of the new standard put the Legislature in direct conflict with the Alabama Constitution which prohibits the division of counties between districts, subject to the requirements of federal law and with the non-discrimination provisions of the Voting Rights Act and the 10 percent population deviation standard of the Fourteenth Amendment as interpreted by the United States Supreme Court.   Absent direct conflict with federal law, the state constitutional provisions retain their full force. *Sims v. Baggett*, 247 F. Supp. 96, 101 (M. D. Ala. 1965).  See also *Bartlett v. Strickland*, 129 S. Ct. 1231 (2009).  In adoption of the artificially low deviation standard, the Legislature knowingly forced violations of the Alabama Constitution, including specifically Section 200 of the Alabama Constitution which provides that "no county should be divided between districts"  and Section 199, which mandates that the Legislature "apportion [the representatives] among the several counties of the state according to the number of inhabitants in them, respectively; provided that, each county shall be entitled to at least one representative."  See also Section 198, which mandates that whenever a new county is created it must have its own member of the House of Representatives.

37.     Adherence to the state constitution is a factor normally considered important by state legislative bodies.

11

38.    Beyond the commands of the Alabama Constitution there are many important governmental interests in respecting county boundaries and redistricting that were well known to the Legislature.  See *Larios v. Cox*, 300 F. Supp. 2d 1320 (M.D. Ga. 2004), *aff'd sub nom., Cox v. Larios*, 124 S. Ct. 2806 (2004).  The integrity of counties has special significance in the State of Alabama because the Legislature controls city and county government matters normally controlled by localities themselves.  These include local government salaries, appointments to local boards and commissions, taxing powers, and municipal annexations and de-annexations.  Passage of such local legislation for a particular county requires the unanimous consent of legislators who represent all or part of the county, and the unnecessary division of a county among two or more legislative districts can complicate passage of local legislation and thwart positive local initiatives and reforms.

39.    The Alabama State Legislature adopted the artificial standard of 2% population deviation range under the cloak of *Larios v. Cox, supra*.  The stated rationale for the 2% limitation was to prevent discrimination against any group.  The *Larios* Court, however, repeatedly pointed to Georgia's legislative splitting of county boundaries and splitting of counties among multiple districts as part of the compelling evidence of the invidious, unconstitutional nature of the plan, which was to maximize political gains by a systematic regional population imbalance that, in effect, shifted one or more legislative seats from one region of the state to another.  And it is plain that even absolute population equality is no barrier to racial discrimination in redistricting or any discrimination whatsoever other than, in extreme cases, a regional tilt in representation.  See, e.g., *LULAC v. Perry*, 548 U.S. 399 (2006).

40.    The true purpose of the adoption of the ±1% deviation standard was to give the Legislature more leeway than allowed by the Alabama Constitution in gerrymandering districts to

12

the detriment of black and other minority voters and those in coalition with them.

41.    While a number of counties need to be split by a House redistricting plan in order to comply with federal law, certain counties need not be split because their populations are divisible by the ideal district population.  In the House, these counties include Jefferson and Montgomery.  In each case it is possible to maintain the existing number of black districts in those counties with all districts drawn within the county.  These "drop-in" counties can be inserted into any plan that respects county boundaries.

42.    Alternative redistricting plans were proposed and/or available to the Legislature that would have provided for greater minority representation, adhered more closely to past redistricting principles, and better followed the command of the Alabama Constitution.

43.    In enacting the House and Senate plans, the Alabama Legislature departed from past practices in additional ways.  While the State held a series of public hearings on redistricting, the Legislature provided no information, not even maps of current districts at those hearings.  Minority citizens and others raised issues including over the county boundary rule and the artificially low deviation standard.

44.    The actual districts were drawn behind closed doors with white legislative leadership and other white members of the majority.  The process lacked the discussion and horse-trading that uniformly had marked previous state legislative redistricting. The closest approaches to a substantive conversation with any member who had been supported by black voters appear to have been invitations to Democratic House Representative Joe Hubbard (District 73) and Senator Marc Keahey (District 22) to change parties and to become Republicans which would have been a prelude to substantive discussion.  Both declined and their districts were gerrymandered as a result.

13

45. Minority legislators repeatedly expressed concern and frustration at the exclusion from the redistricting process, but the Legislature ignored their complaints. The Redistricting Committee did not consider bills that had been introduced by black legislative members. The majority bill went to the floor where action followed a pattern that has dominated the Legislature since 2010 elections. Black members of the Legislature introduced their plans as substitutes. They and their allies talked for a while and then the all white majority voted "cloture" and passed their own bill without amendment.

46. The many intentionally discriminatory actions by the Legislature in adopting the House and Senate plans taken to minimize and cancel out minority voting strength include but are not limited to the following examples:

a. The Legislature eliminated a nascent minority district (District 73) in Montgomery County. During the course of the decade the white population of the district had shrunk from nearly 70 percent of the total to only 44 percent of the total. The district had swung to support black candidates and candidates favored by black voters, so that District 73 was a crossover district and was in the process of becoming an effective black majority district. The Legislature abolished this predominantly minority district in Montgomery for the purpose of denying black and other minority voters an opportunity to maintain or to form coalitions and elect candidates of their choice, and to prevent the development of a majority black district in Montgomery.

b. The 2010 census showed that it was possible to redraw District 73 as a district with a black voting age majority in a plan that did not split Montgomery County between districts. Instead of recognizing legitimate minority political opportunities in

Montgomery County, the Legislature packed the three black districts with excessive black majorities; retained and bolstered the existing white-controlled districts, including by splitting the county to import suburban white population; and transferred District 73 to Shelby County, a rapidly growing white area, all with the invidious purpose of minimizing and cancelling out minority opportunities for political success, and with the effect of denying the right of black voters to elect a candidate of their choice.

c.      The 2010 census demonstrated that the boundaries of Jefferson did not need to be split for population equality purposes. The county contained eight districts with black population majorities, seven of which were and are represented by black representatives. The 2010 census showed that all eight districts could be maintained consistent with federal and state statutory and constitutional requirements. Rather than recognize legitimate minority political opportunities, the Legislature eliminated one of the seven districts represented by a black representative with the invidious discriminatory intent to minimize and cancel out opportunities for minority political success, and with the result of denying the right of black voters of an equal opportunity to elect a candidate of their choice.

d.      The 2010 census demonstrated that the minority population in Madison County was concentrated so that minorities had the potential to predominate in a Senate district in a coalition district or a crossover district. Instead of drawing a district that realized this potential, the Legislature exacerbated the existing fragmentation of the minority community so as intentionally to deny and cancel out minority voting strength and to thwart legitimate minority political opportunities.

15

e.      Prior to the 2012 redistricting, Senate District 22 was a crossover district. District 22 contained substantial black and Native American populations, much of the latter historically having been concentrated in the Mount Vernon and McIntosh of Mobile and Washington Counties (MOWA Choctaw Band).   The State of Alabama subjected the MOWA Choctaw and other Native Americans to racial segregation and pervasive discrimination.  Black and Native American citizens of the area of former District 22 share many common governmental interests and vote cohesively.  The Legislature redrew Senate District 22 so as intentionally to disrupt and disenfranchise the effective coalition of black, Native American and other citizens who long had elected Senators of their choice from that area.  In doing so, the Legislature fragmented the MOWA Choctaw and other minority communities and avoided minority population concentrations so as to create a grotesque, oddly shaped district in which minority voters will not enjoy an opportunity to elect candidates of their choice. The Legislature redrew Senate District 22 so as to intentionally minimize and cancel out minority political opportunities.

f.      Prior to the 2012 redistricting, Senate District 11 was a crossover district. The Legislature redrew Senate District 11 so as to disrupt and disenfranchise the effective coalition of black and other citizens who long had elected Senators of their choice from that area.  In doing so the Legislature fragmented compact minority communities and avoided minority population concentrations so as to create another grotesque, oddly shaped district in which minority voters will not enjoy an opportunity to elect candidates of their choice. The Legislature redrew Senate District 11 so as intentionally to minimize and cancel out minority political opportunities.

16

## COUNT I

## VOTING RIGHTS ACT

47.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

48.     The proposed House and Senate plans set forth in Act No. 2012-602 and Act No. 2012-603 violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, in that each was adopted with a racially discriminatory purpose of minimizing and diluting the opportunities for minority voters to participate effectively in the political process, and to elect candidates of their choice to the Alabama Legislature; and that each plan would have the result of discriminating against minority voters on account of their race and membership in a language minority group and deny them an equal opportunity to elect candidates of their choice to the Alabama Legislature.

## COUNT II

## RACIAL GERRYMANDERING

49.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

50.     Alabama Acts 2012-602 and 2012-603 were drawn for the purpose and effect of minimizing the opportunity of minority voters to participate effectively in the political process and for the purpose of capping African American and other minority representation and influence in the Alabama House and Senate.

51.     The racial gerrymandering by Alabama Acts 2012-602 and 2012-603 violates the rights of Plaintiffs guaranteed to them by the Fourteenth and Fifteenth Amendments of the Constitution of the Unites States. *Gomillion v. Lightfoot,* 364 U.S. 339 (1960).

## COUNT III

## 42 U.S.C. SECTION 1983 CLAIM

52.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

53.     Plaintiffs bring this action to redress violations of their constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Constitution of the Unites States and enforce those rights pursuant to 42 U.S.C. Section 1983.

54.     These violations were conducted under color of state law, i.e., Acts 2012-602 and 2012-603.

## PLAINTIFFS PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

1.     That the Court take jurisdiction of this case;

2.     To cause a three judge panel to form to hear this case;

3.     To declare Acts 2012-602 and 2012-603 violate Section 2 of the Voting Rights Act, 42 U.S.C. §1973 and are unconstitutional as violating the Fourteenth and Fifteenth Amendment of the United States Constitution;

4.     To enjoin Defendants Governor Bentley and Chapman from enforcing the provisions of those Acts;

5.     To order and direct the Alabama Legislature to enact reapportionment laws for the state House and Senate that meet the requirements of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendment. Should the Legislature fail in this endeavor, allow the parties to present to the Court proposed reapportionment districts for the Alabama House and Senate, or the Court devise a plan that meets stated

18

requirements.

6.    Award costs and attorneys' fees, reasonable experts' fees and other reasonable expenses to Plaintiffs as provided by 42 U.S.C. 1973(l) (e) and 42 U.S.C. Section 1988;

7.    To provide other equitable, injunctive or declaratory relief necessary for this action;

**RESPECTFULLY SUBMITTED** this 13th day of December, 2012.

**JAMES H. ANDERSON [ANDE4440]**
**WILLIAM F. PATTY [PATTW4197]**
**JESSE K. ANDERSON [ANDEJ8821]**
JACKSON, ANDERSON & PATTY, P.C.
P.O. Box 1988
Montgomery, AL 36102
(334) 834-5311 (334) 834-5362 (fax)
bpatty@jaandp.com; janderson@jaandp.com
Jkanderson@jaandp.com

**WALTER S. TURNER [ABA 6307R49W]**
2222 Narrow Lane Road
Montgomery, AL 36106
334-264-1616; wsthayer@juno.com

**JOHN K. TANNER [DC BAR # 318873]**
3743 Military Road, NW
Washington, DC 20015
202-503-7696; john.k.tanner@gmail.com
**Appearing pro hac vice**

**JOE M. REED [ABA 7499-D59J]**
Joe M. Reed & Associates, LLC
524 S Union St.
Montgomery, AL 36104-4626
T(334) 834-2000; F (334) 834-2088
joe@joereedlaw.com

19

**DEFENDANTS MAY BE SERVED VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AS FOLLOWS:**

State of Alabama
c/o Robert J. Bentley, Governor of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Al 36104

State of Alabama
c/o Luther Strange, Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36104

Robert J. Bentley, Governor of Alabama
State Capitol Building
600 Dexter Avenue
Montgomery, Al 36104

Beth Chapman, Alabama Secretary of State
Office of the Alabama Secretary of State
State Capitol Building - Suite S-105
600 Dexter Avenue
Montgomery, Al 36104

20