**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **DEMETRIUS NEWTON, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **2:12-cv-1081 (3-judge court)** |
| **THE STATE OF ALABAMA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## INTERVENORS' ANSWER

Gerald Dial, Senate Chairman of the Permanent Legislative Committee on Reapportionment of the State of Alabama, in his official and/or individual capacity, and  Jim McClendon, House Chairman of the Permanent Legislative Committee on Reapportionment of the State of Alabama, in his official and/or individual capacity (collectively "Intervenors"), answer the Plaintiffs' complaint as follows:

1.    This action challenges Act No. 2012-602, which redistricts the Alabama House of Representatives, and Act No. 2012-603, which redistricts the Alabama Senate under Section 2 of the Voting Rights Act, 42 U.S.C. 1973, and the Fourteenth and Fifteenth Amendments of the United States Constitution.  Said Acts would result in discrimination against black and other minority voters on

account of their race or membership in a language minority group and they were adopted with a racially discriminatory purpose.   The Acts constitute racial gerrymandering in violation of the Fourteenth and Fifteen Amendments of the U.S. Constitution and continues practices of racial discrimination condemned by the U.S. Supreme Court in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

**ANSWER:   The first sentence of paragraph 1 requires no response.  To the extent a response is required to the first sentence of paragraph 1, the Intervenors deny those allegations.   The Intervenors deny the remaining allegations of paragraph 1.**

2.    Plaintiff Demetris Newton is an adult African American citizen of the United States of America (hereinafter "U.S.") and the State of Alabama.  Plaintiff Newton is a registered voter in Jefferson County, Alabama who votes in the former House District 53.  Plaintiff Newton is the state house representative of former House District 53.

**ANSWER:    The Intervenors admit the allegations of paragraph 2.**

3.    Alabama Democratic Conference (hereinafter "ADC") is a statewide political caucus formed in 1960.  It has members in almost every county in the State of Alabama, including each county involved in this action.  The purpose of ADC is to endorse candidates for political office who will be responsive to the

needs of the black, other minorities and poor people in the State of Alabama. ADC's purpose is also to protect the voting rights of racial minorities in the State of Alabama.   ADC worked closely with the Alabama legislative committee to redraw the state senatorial and representative districts in 1980, 1990 and 2000 for the State of Alabama. ADC attempted to participate in that process in 2010.

**ANSWER:   On information and belief, the Intervenors admit the allegations in the first five sentences of paragraph 3 except that the Intervenors deny that the Alabama Democratic Conference has associated standing to pursue the claims made by the *Newton* plaintiffs, standing to pursue racial gerrymandering claims, or both.   The Intervenors state further that, to the extent that the Alabama Democratic Conference states that it assisted in the drawing of the 1990 and 2000 legislative redistricting plans, ADC contributed to, among other things, substantial litigation and the related expense to the State and to complaints from Republican interests about systematic and intentional favoritism of black and Democratic interest.   The Intervenors deny the remaining allegations of paragraph 3.**

4.    Plaintiff Framon Weaver, Sr. is an adult Native American citizen of the U.S. and the State of Alabama.   Plaintiff Weaver is a registered voter in Washington County, Alabama, who votes in the former Senate District 22.

**ANSWER:   On information and belief, the Intervenors admit the allegations of paragraph 4 except that the Intervenors deny any allegation, express or implied, that Mr. Weaver and any others claiming to be members of the MoWa Choctaw Band have standing to assert claims as American Indians under the Voting Rights Act.**

5.      Plaintiff Stacey Stallworth is an adult African American citizen of the U.S. and the State of Alabama.   Plaintiff Stallworth is a registered voter in Montgomery County, Alabama, who votes in the former House District 73.

**ANSWER:   On information and belief, the Intervenors admit the allegations of paragraph 5.**

6.      Rose Toussaint is an adult, Hispanic citizen of the U.S. and the State of Alabama.   Plaintiff Rosa Toussaint is a registered voter in Madison County, Alabama, who votes and lives within the area of a potential minority, coalition and/or crossover senate district which, for a racially discriminatory purpose, the Legislature failed to adopt.

**ANSWER:   On information and belief, the Intervenors admit that Rosa Toussaint is an adult, Hispanic citizen of the United States and the State of Alabama who is registered to vote in Madison County, Alabama, and deny the remaining allegations of paragraph 6.**

7.     Plaintiff Lynn Pettway is an adult African American citizen of the U.S. and the State of Alabama.  Plaintiff Pettway is a registered voter in Montgomery County, Alabama, who votes in the former House District 73.

**ANSWER:   On information and belief, the Intervenors admit the allegations of paragraph 7.**

8.     Defendant State of Alabama is one of the states of the United States of America and is subject to the Voting Rights Act and the Constitution of the United States.   Defendant Robert J. Bentley is sued in this official capacity as Governor of the State of Alabama.  As Governor, he is the chief executive officer responsible for executing the laws of the State of Alabama.  Defendant Mary Beth Chapman (hereinafter referred to as "Defendant Chapman") is sued in her official capacity as Secretary of State of Alabama.  In that capacity, Defendant Chapman is the chief elections official in the State of Alabama and is the official with authority and responsibility to certify the election of members of the Alabama Legislature.

**ANSWER:    The Intervenors admit the allegations of paragraph 8.**

## JURISDICTION

9.     This case is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments of the Constitution of the United

States of America.  This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1357, 2201, 2201, and 2284.

**ANSWER:   Paragraph requires no response because the parties cannot create federal jurisdiction by consent.  To the extent a response is required, the Intervenors deny that this Court has subject matter jurisdiction as to the State of Alabama, which is sued in its own name, and further deny that this Court has subject-matter jurisdiction to any extent to which the Newton plaintiffs seek to have this Court order, instruct, or enjoin the Intervenors on how to conform their conduct to state law.**

10.    A three-judge District Court panel must be convened pursuant to 28 U.S.C. § 2284 in that this action challenges the constitutionality of the apportionment of a statewide legislative body.

**ANSWER:  With respect to the allegations of paragraph 10, the Intervenors admit that a three-judge court has been properly convened to hear this case.**

## VENUE

11.    Venue of this action is proper in the Middle District of Alabama pursuant to 28 U.S.C. § 1391(b).

**ANSWER:    The Intervenors admit the allegations of paragraph 11.**

## FACTS

12.    On May 31, 2012, the Defendant Governor Bentley signed into law Acts 2012-602 and 2012-603.   Act 2012-602 redrew the Alabama House of Representatives districts and Act 2012-603 redrew the Alabama Senate districts pursuant to 2010 census data.   Plaintiffs contend that said Acts, as passed, were for the purpose of gerrymandering voting districts by the dilution, packing and artificial capping of black or other minority voting strength in order that they would result in discrimination against black and other minority voters of the State of Alabama.   The Acts unnecessarily maximize or pack majority -black or other minority voting-age population into voting districts and segregate and fragment African American or other minority voting strength.

**ANSWER:   With respect to the allegations of paragraph 12, the Intervenors admit the allegations in the first two sentences and deny the remaining allegations.**

13.    According to the 2010 Census, the population of the State of Alabama was 4,779,736 persons, of whom 3,204,402 (67.0%) were white non-Hispanic persons, 1,251,311 (26.2%) were black persons, and 253,031 (5.9%) were

members of other races or identified themselves as being of more than one race. Hispanic persons who may be of any race comprised 3.9% of the population.

**ANSWER:    The Intervenors admit the allegations of paragraph 13.**

14.    The Alabama House of Representatives consists of 105 members elected from single-member districts.   The Alabama Senate consists of 35 members elected from single-member districts.

**ANSWER:    The Intervenors admit the allegations of paragraph 14**.

15.    The proposed redistricting plans provide for 26 House districts (24.8%) and eight Senate districts (22.9%) in which eligible black voters (i.e., those not incarcerated in facilities of the Alabama Department of Corrections) comprise a majority of the voting age population.   The population of and the racially polarized voting patterns in the remaining House districts (79 or 75.3%) and Senate districts (27 or 77%) are such that minority voters will be frozen out of opportunities for electoral influence beyond the quota of seats designated for them by the Legislature.

**ANSWER:  With respect to the allegations of paragraph 15, the Intervenors admit that, in the 2012 Senate plan, there are 8 districts in which a majority of the total population is African-American, and that, in the 2012 House plan, there are 28 districts in which a majority of the total population is**

**African-American; state further that, in the drafting of the 2012 redistricting plans, the Legislature used total population figures as the basis for the apportionment as it has done with previous plans, and deny the remaining allegations**.

16.     The House and Senate redistricting plans provide for substantial over-representation of white persons and under-representation of black and other minority persons.

**ANSWER:     The Intervenors deny the allegations of paragraph 16.**

17.     Minority population in Alabama is concentrated so that black citizens and/or minorities generally could constitute majorities in additional areas of the State.  The House and Senate redistricting plans, however, fragment or pack black and other minority populations so as to avoid creating districts in which black or other minority voters could elect candidates of their choice to the Legislature. Such areas include, but are not limited to, Jefferson and Montgomery Counties in the House plan and Madison County in the Senate plan.  Minority population in Alabama also is concentrated so that black persons have been able, in collation with other groups, to exert decisive influence over legislative elections; and the plans fragment areas in which black have formed crossover districts in which dependable coalitions elect candidates who are the choice of minority voters.

**ANSWER:    The Intervenors deny the allegations of paragraph 17.**

18.    Elections in Alabama are characterized by racial bloc voting in that there is a consistent relationship between the race of the voter and the way in which the voter votes.   Black voters usually provide very large majorities to candidate whom they support and white voters usually cast very large majorities in opposition to the candidates supported by black voters.

**ANSWER:  With respect to the allegations of paragraph 18, the Intervenors admit that, when partisan campaigns are involved, African-American voters in Alabama generally vote for Democratic candidates and that many, but not all, white voters often vote for Republican candidates.  They deny that such partisan alignment, in and of itself, constitutes racially polarized voting.  The Intervenors further deny that any such partisan alignment is state action for which they, or their predecessors, are responsible.  The Intervenors lack knowledge sufficient to admit or deny any allegation, express or implied, that there is a significant degree of racially polarized voting in non-partisan elections and deny them on that basis.  The Intervenors deny the remaining allegations of paragraph 18.**

19.    Black citizens of Alabama continue to bear the effects of the state's long, pervasive and persistent history of discrimination.  Black citizens suffer from

disparities in such areas as income, education, employment and health that affect their ability to participate in the political process.

**ANSWER:   With respect to the allegations of paragraph 19, the Intervenors admit that, as a historical matter, black citizens in Alabama generally suffer from disparities in income, education, employment, and health. The Intervenors deny any allegation, express or implied, that they have any present responsibility for any such disparity, that such disparity had or has any effect on the 2012 redistricting plans, or both, and further deny the remaining allegations of paragraph 19.**

20.    White officials of the State of Alabama have acted and continue to act intentionally to deter participation by black citizens and to disrupt and hamper black political organization.

**ANSWER:   With respect to the allegations of paragraph 20, the Intervenors admit that, as a historical matter, white officials in Alabama -- who for the past 150 years have been almost exclusively Democrats -- acted to deter participation by black citizens and to disrupt and hamper black political organizations.   The Intervenors deny any allegation, express or implied, that they have any present responsibility for such past actions, that such past actions**

had or has any effect or the 2012 redistricting plans, or both, and further deny the remaining allegations of paragraph 20.

21.    Racial discrimination in voting and other areas has extended in recent years to other minorities, including Hispanic, Native American and Asian citizens of Alabama, as those groups have become more numerous and visible.

**ANSWER:    The Intervenors deny the allegations of paragraph 21.**

22.    The State of Alabama has a long history of discrimination against black voters, and the history of the adoption of the House and Senate redistricting plans continues a series of actions taken with a racially discriminatory purpose.

**ANSWER:    With respect to the allegations of paragraph 22, the Intervenors admit that the State of Alabama has a history of discrimination against black voters.  The Intervenors deny any allegation, express or implied, that they have any present responsibility for that history of past discrimination, that that history of past discrimination had or has any effect on the 2012 legislative redistricting plans, or both, and further deny the remaining allegations of paragraph 22.**

23.    Hundreds of state and local voting practices have been enjoined by the federal courts as racially discriminatory.   United States Attorneys General have entered Section 5 objections to Alabama and its political subdivisions

regarding its voting laws over a hundred times. Alabama elections have been marked by mistreatment and intimidation of black citizens, and Attorneys General have assigned federal observers to monitor over 185 Alabama elections, including recent elections in 2006, 2008, 2010 and 2012. Each instance of assignment of federal observers required a finding by the Attorney General that such observers were necessary in order to enforce the guarantees of the Fourteenth and Fifteenth Amendments.

**ANSWER: With respect to the allegations of paragraph 23, the Intervenors admit that federal courts have found some State and local voting practices to be racially discriminatory, that the Attorneys General of the United States have occasionally objected to proposed changes in voting laws submitted by the State or its political subdivisions, that the Attorney General has assigned monitors to observe elections in Alabama, and that the assignment of monitors followed a finding by the Attorney General. The Intervenors deny any allegations, express or implied, that they have any responsibility for the past events referred to, that those past events had or has any effect on the 2012 legislative redistricting plans, or both. The Intervenors state further that the court findings and objections are almost completely, if not completely, from the past, and that any finding by the Attorney General of the United States that**

**monitors are necessary is made ex parte and is unreviewable.  The Intervenors**

**deny the remaining allegations of paragraph 23.**

24.    After passage of the Voting Rights Act and after years of enforcement

of its salutary provisions of the Alabama Legislature enjoyed a period in which

black voters and their representatives enjoyed some influence in the Alabama

Legislature and were in a position, from time to time, to pull, haul and trade to

obtain advances for all citizens.   In 2010, however, an all-white group of

legislators hostile to the electoral aspirations of black or other minority voters of

Alabama gained control of both houses of the Alabama Legislature and the

Governor's office.   In the 2010 statewide elections, this white group won

filibuster-proof majorities in both the House of Representatives and the Senate of

the Alabama Legislature and proceeded systematically to undermine and

minimize the influence, effectiveness and participation of black voters in

Alabama, and to eliminate any effective opportunity to pull, haul and trade to

achieve their legislative goals.

**ANSWER:  With respect to the allegations of paragraph 24, the**

**Intervenors admit that, after the 2010 legislative elections, the Republicans held**

**filibuster-proof majorities in both houses in the Alabama Legislature, that the**

**Governor is a Republican, and that black voters and their representatives have**

**had and continue to have influence in the Legislature.  The Intervenors state further that, to the extent those legislative majorities are attributable to the electoral process, those elections took place under districts drawn by the previous Democratic majority, and deny the remaining allegations of paragraph 24.**

25.    A rare glimpse into the attitudes and motives of the dominant all white-faction of the Legislature comes from tape recordings of white legislators who wore recording devices as part of a federal investigation of public corruption. In addition to investigation-related conversations, white legislators inadvertently recorded conversations with their white allies.  In *United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011), the Court made detailed factual findings respecting two key witnesses, State Senate Rules Committee Chair Scott Beason and State Representative Benjamin Lewis.  The Court found that both men lacked credibility for two reasons.  First, the motive for cooperating with the FBI investigators was not to clean up corruption but to increase their political fortunes by reducing African American voter turn out.  Second, the Court found that they lacked credibility because the record established their purpose was racially motivated.

**ANSWER:   The allegations of paragraph 25 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.   To the extent a response is required, the plaintiffs selectively refer to this Court's decision in *United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011).   The Intervenors admit that the decision states what is published on page 1345 and deny the remaining allegations of paragraph 25.**

26.    Beason and Lewis and their allies, sought to defeat a proposed constitutional amendment on gaming which would require a statewide referendum partly because they believed that if the gambling referendum were not on the ballot it would lower African American turn-out in the 2010 elections. Both Beason and Lewis made racially derogatory remarks.  The remarks were made while Beason and Lewis were discussing political strategy with other influential white legislative allies.  The Court found that these remarks reflected a racist animus toward African American citizens of Alabama.  The Court also found that the remarks reflected a racial animus toward Native American citizens who, in Alabama, tend to be concentrated within the area of "old" (Senate Plan adopted in 2001, or pre-Act No. 2012-602) Senate district 22 (Keahey).

**ANSWER:   With respect to the allegations of paragraph 26, the Intervenors incorporate their response to paragraph 25 as if fully set forth at this point of their answer and deny the remaining allegations of paragraph 26.**

27.    The Court specifically found that these white legislators in the dominant faction "singled out African Americans for mockery and racist abuse . . . Beason's and Lewis' statements demonstrate a deep seeded racial animus and a desire to repress black votes by manipulating what issues appeared on the 2010 ballot.   The Beason and Lewis recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this state." *Id.* at 1345-1348.

**ANSWER:    The allegations of paragraph 27 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.   To the extent a response is required, the plaintiffs selectively refer to this Court's decision in *United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011).   The Intervenors admit that the decision states what is published on page 1346 and 1347 and deny the remaining allegations of paragraph 27.**

28.    None of the other white leaders involved in these and other recorded calls made any objection or other comment regarding the racist comments of

Beason and Lewis.  In response to the public release of the tape recordings there was deafening silence from the leadership of the all-white dominant Legislative faction.  The comments by Beason and Lewis were made public in February 2011, but in June 2011, the State Republican Chair was defending Beason.  Beason did not offer any public apology for his comments until September 27, 2011, and even then, and in the face of widespread criticism and condemnation of Beason and Lewis (now appointed to a state court judgeship), Senate President Pro tem, Del Marsh, allowed Beason "the benefit of the doubt" and allowed Beason to retain his powerful Rules Committee Chairmanship.  Sen. Marsh did not remove Beason as Rules Committee Chair until November 15, 2011.

**ANSWER:   The allegations of paragraph 28 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.   To the extent a response is required, the Intervenors admit that, in November 2011, the Senate President Pro Tem removed Beason from the Rules Committee, and that Lewis is now a state district trial judge.   The Intervenors deny the remaining allegations of paragraph 28.**

29.   As their lack of critical comments and the indifference of the white legislative leadership to the comments show, the racist opposition to black

political participation on the part of the dominant all-white faction of the Legislature is not limited to the election of black members of the Legislature.  The racial animus extends to opposition to equal black political participation in referenda such as the gaming referendum and the right of black citizens to form coalitions and to enjoy an opportunity to pull, haul and trade in the political process as equal citizens of Alabama and the United States.

**ANSWER:   The allegations of paragraph 29 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.   To the extent a response is required, the Intervenors deny the allegations of paragraph 29**.

30.   Senator   Beason   also   figured   prominently   in   another contemporaneous racial action in the Legislature.  He was the principal author and co-sponsor of the State's notorious anti-immigration legislation, much of which was voided as unconstitutional.  Senator Beason made statements that the Legislature was motivated in part by a concern that "when their children grow up and get a chance to vote, they vote for Democrats."

**ANSWER:   The allegations of paragraph 30 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.   To the extent a**

**response is required, the Intervenors admit that the State enacted an immigration law, portions of which were held to be preempted by federal law or otherwise enjoined and other portions of which have survived facial legal challenge, and deny the remaining allegations of paragraph 30.**

31.     In 2010, there was no gambling referendum on the 2010 ballot and the elections placed firm control of the Alabama Legislature in the hands of Senator Beason and his confederates.  The newly elected legislators were sworn in on the heels of the election in November 2010, and outgoing Republican Governor Riley promptly called a special session purportedly designed, like the anti-gambling efforts, to stop corruption, but more directly aimed at suppression black political participation.  Act 2010-764 placed a ban on transfers between political action committees and 527 organizations (PAC to PAC transfers).  The intended effect of the ban on PAC to PAC transfers, until it was enjoined as unconstitutional in *ADC v. Strange*, N. 5:11-cv-02449-JEO (M.D. Ala. December 14, 2011), was to block funding for black "Get Out the Vote" activities such as those regularly performed by the Alabama Democratic Conference, Alabama New South Coalition and other black political organizations.  Although the stated goal was to block corruption in campaign spending, the Legislature continued to allow unlimited contributions directly to candidates from individuals and corporations

that the United States Supreme Court repeatedly has held is the only form of campaign spending that creates corruption. *Buckley v. Valeo*, 424 U.S. 1 (1976); *Citizens United v. Federal Election Commission*, 558 U.S. 50 (2010).

**ANSWER:** **The allegations of paragraph 31 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required. To the extent a response is required, the Intervenors admit that a gambling referendum did not appear on the ballot in November 2010; that the Republicans held filibuster-proof majorities in both houses of the Alabama Legislature after those elections; that, in the special session held in November 2010, the Alabama Legislature passed and then-'Governor Riley signed Act No. 2010-764, which placed limits under state law on the transfer of funds between and among political action committees and 527 organizations; that in *ADC v. Strange*, the United States District Court for the Northern District of Alabama declared that ban unconstitutional on First Amendment grounds, a ruling that is now on appeal. The Intervenors state further that, to the extent that legal conclusions are asserted in paragraph 31, no response is required and deny the remaining allegations of paragraph 31. The Intervenors state further that the district court dismissed the Section 2 claims asserted by the ADC plaintiffs in *ADC v. Strange*.**

32.    The November 2010 special session also produced another law that has since been enjoined as unconstitutional, Act No. 2010-761.  This law placed a ban on payroll deductions for public employees or any organization that engages or has engaged at least once in political activity.  The Act was aimed openly and squarely at public employee unions and most especially with what the Alabama Republican Party has called the "radically liberal . . . anti-religious, anti-American Alabama Education Association."  The AEA, is the product of a merger in 1969 between formerly all-white AEA and all black Alabama State Teachers Association (ASTA) which then, as now, "was viewed as a liberal, pro-black lobby."  *Knight v. Alabama*, 458 Supp. 2d 1273, 1295 (M.D. Ala. 2004).

**ANSWER:    The allegations of paragraph 32 are scandalous, impertinent, and immaterial and should be struck from the complaint pursuant to Federal Rule of Civil Procedure 12(f), so no response is required.  To the extent a response is required, the Intervenors admit that, in the special session held in November 2010, the Alabama Legislature passed and then-Governor Riley signed Act No. 2010-761, which bars the use of payroll deductions to fund the activities of public employee and other unions; that the application of Act No. 2010-761 was preliminarily enjoined (though the Eleventh Circuit narrowed the scope of that injunction; and that, in *Knight v. Alabama*, 458 F. Supp. 2d 1273**

(M.D. Ala. 2004), the United States District Court for the Middle District of Alabama stated, "In the years between passage of Amendment 325 in 1971 and the *Weissinger* court's 1979 deadline, *Governor Wallace* . . . was opposed principally by the Alabama Education Association ("AEA"), which had merged with the all-black Alabama State Teachers Association ("ASTA") and viewed as a liberal, pro-black lobby." *Id.* at 1295 (emphasis added). The Intervenors deny the remaining allegations of paragraph 32. The Intervenors state further that an appeal from the district court's entry of the preliminary injunction is now pending and that the Eleventh Circuit has certified questions of Alabama law to the Supreme Court of Alabama.

33. The Legislature, before adopting the reapportionment plans contained in Act Nos. 2012-602 and 2012-603, adopted redistricting standards that guaranteed the House and Senate plans would violate the Alabama Constitution. In addition to the written standards, Senate President Pro Tem, Del Marsh, openly stated his intent that all-white majority Senate districts should elect members favorable to the all-white faction, cementing its control of the Legislature and institutionalizing the minimization of black political strength.

**ANSWER: The Intervenors deny the allegations paragraph 33. The Intervenors state further that the Guidelines adopted in 2011 are almost**

**identical to those adopted by the Democrats in 2001, that one difference is in the adoption of an overall population deviation of 2% in place of the former 10%, and that an overall deviation of 2% does not violate the United States Constitution or the Constitution of the State of Alabama.**

34.    In adopting the redistricting plans, the Legislature departed from previous legislative standards and from considerations normally considered important by the decision-maker.  The Legislature departed from uniform past practice and adopted as a standard that the district population deviations could not exceed ± 1%, or 2% total rather than the legally permissible + 5%, or 10% total deviation range used by most states and used uniformly by the State of Alabama in legislative redistricting since the early 1970s.

**ANSWER:  With respect to the allegations of paragraph 34, the Intervenors admit that, in the 2012 legislative plans, the allowable total population deviation between districts in both plans is 2% and that, in previous plans, the total allowable population deviation between districts was 10%.  The Intervenors deny the remaining allegations of paragraph 34.  The Intervenors state further that, in their preclearance submission letters for the State Board of Education, State Senate, and State House of Representatives redistricting plans, they drew the change in the total allowable population deviation between**

**districts to the attention of the Attorney General of the United States, and the Attorney General made no objection to that change**.

35.   The Legislature adopted this standard in order to effectuate a plan to pack black voting districts, fragment black voting districts, dilute black voting districts, and cap black representation and influence.

   **ANSWER:   Denied.**

36.   The adoption of the new standard put the Legislature in direct conflict with the Alabama Constitution which prohibits the division of counties between districts, subject to the requirements of federal law and with the non-discrimination provisions of the Voting Rights Act and the 10 percent population deviation standard of the Fourteenth Amendment as interpreted by the United States Supreme Court.   Absent direct conflict with federal law, the state constitutional provisions retain their full force. *Sims v. Baggett*, 247 F. Supp. 96, 101 (M.D. Ala. 1965). *See also Bartlett v. Strickland*, 129 S. Ct. 1231 (2009). In adoption of the artificially low deviation standard, the Legislature knowingly forced violations of the Alabama Constitution, including specifically Section 200 of the Alabama Constitution which provides that "no county should be divided between districts" and Section 109, which mandates that the Legislature "apportion [the representatives] among the several counties of the state

according to the number of inhabitants in them, respectively; provided that, each county shall be entitled to at least one representative." See also Section 198, which mandates that whenever a new county is created it must have its own member of the House of Representatives.

**ANSWER:   The allegations of paragraph 35 plead legal conclusions to which no response is required.   To the extent a response is required, the Intervenors deny the allegations of paragraph 36.**

37.   Adherence to the state constitution is a factor normally considered important by state legislative bodies.

**ANSWER:   With respect to the allegations of paragraph 37, the Intervenors admit that state legislative bodies normally consider compliance with the state constitution important and deny the remaining allegations.  The Intervenors further deny any allegation, express or implied, that the Alabama Legislature did not consider compliance with the pertinent provisions of the Alabama Constitution important or did not comply with those provisions when they adopted the 2012 legislative redistricting plans.  The Intervenors further deny any allegation, express or implied, that this Court has subject matter jurisdiction to any extent to which the *Newton* plaintiffs seek to have this Court**

**order, instruct, or enjoin the Intervenors on how to conform their conduct to state law.**

38.     Beyond the commends of the Alabama Constitution there are many important governmental interests in respecting county boundaries and redistricting that were well known to the Legislature.  *See Larios v. Cox*, 300 F. Supp. 2d 1320 (M.D. Ga. 004), *aff'd sub nom., Cox v. Larios*, 124 S.Ct. 2806 (2004).  The integrity of counties has special significance in the State of Alabama because the Legislature controls city and county government matters normally controlled by localities themselves.  These include local government salaries, appointments to local boards and commissions, taxing powers, and municipal annexations and de-annexations.  Passage of such local legislation for a particular county requires the unanimous consent of legislators who represent all or part of the county, and the unnecessary division of a county among two or more legislative districts can complicate passage of local legislation and thwart positive local initiatives and reforms.

**ANSWER:   With respect to the allegations of paragraph 38, the Intervenors admit that the State of Alabama Reapportionment Committee Guidelines for Congressional, Legislative, and State Board of Education Redistrict (May 2011) state, in pertinent part:**

6.    The following redistricting policies contained in the Alabama Constitution shall be observed to the extent that they do not violate or conflict with requirements prescribed by the Constitution and laws of the United States:

a.    Each House and Senate district should be composed of as few counties as practicable.

\* \* \*

7.    The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama.

\* \* \*

b.    The integrity of communities of interest shall be respected. For purposes of these Guidelines, a community of interest is defined as an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interests; county, municipal, or voting precinct boundaries; and commonality of communications.  Public comment will be received by the Reapportionment Committee regarding the existence and importance of various communities of interest.   The Reapportionment Committee will attempt to accommodate communities of interest identified by people in a specific location. It is inevitable, however, that some interests will be advanced more than others by the choice of particular district configurations  The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

\* \* \*

**The Intervenors deny the remaining allegations of paragraph 38 and further deny any allegation, express or implied, that the legislative redistricting plans adopted in 2012 do not comply with the Guidelines.**

39.     The Alabama State Legislature adopted the artificial standard of 2% population deviation range under the cloak of *Larios v. Cox, supra*.  The stated rationale for the 2% limitation was to prevent discrimination against any group. The *Larios* Court, however, repeatedly pointed to Georgia's legislative splitting of county boundaries and splitting of counties among multiple districts as part of the compelling evidence of the invidious, unconstitutional nature of the plan, which was to maximize political gains by a systematic regional population imbalance that, in effect, shifted one or more legislative seats from one regions of the state to another.  And it is plain that even absolute population equality is no barrier to racial discrimination in redistricting or any discrimination whatsoever other than, in extreme cases, a regional tilt in representation.  See, e.g., *LULAC v. Perry*, 548 US. 399 (2006).

**ANSWER:  With respect to the allegations of paragraph 39, the Intervenors admit that the State of Alabama Reapportionment Committee Guidelines for Congressional, Legislative, and State Board of Education Redistrict (May 2011) state, in pertinent part:**

**2.     Legislative and State Board of Education Districts**

**In accordance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, legislative and State Board of Education districts will be drawn to achieve "substantial equality of population among the various districts."**

> **a.     Any redistricting plan considered by the Reapportionment Committee will comply with all relevant case law regarding the one person, one vote principal of the equal protection clause of the 14th Amendment of the United States Constitution, including but not limited to the cases of *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) *aff'd sub nom Cox v. Larios*, 542 U.S. 947 (2004), and *White v. Regester*, 412 U.S. 755 (1973).   When presenting plans to the Reapportionment Committee, proponents should justify deviations from the ideal district population either as a result of the limitations of census geography, or as a result of the promotion of a consistently applied rational state policy.**

> **b.     In keeping with subpart a, above, a high priority of every legislative and State Board of Education redistricting plan must be minimizing population deviations among districts.   In order to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final legislative or State Board of Education redistricting plan, in every redistricting plan submitted to the Reapportionment Committee, individual district populations should not exceed a 2% overall range of population deviation. The Reapportionment Committee will not approve a redistricting plan that does not comply with this requirement.**

The Intervenors state further that, to the extent that any allegation in paragraph 39 pleads a legal conclusion, no response is required.   The Intervenors deny the remaining allegations of paragraph 39.

40.     The true purpose of the adoption of the ± 1% deviation standard was to give the Legislature more leeway than allowed by the Alabama Constitution in gerrymandering districts to the detriment of black and other minority voters and those in coalition with them.

**ANSWER:    Denied.**

41.     While a number of counties need to be split by a House redistricting plan in order to comply with federal law, certain counties need not be split because their populations are divisible by the ideal district population. In the House, these counties include Jefferson and Montgomery.   In each case it is possible to maintain the existing number of black districts in those counties with all districts drawn within the county.   These "drop-in" counties can be inserted into any plan that respects county boundaries.

**ANSWER:   With respect to the allegations of paragraph 41, the Intervenors admit that, in the 2012 and in previous plans, it was necessary to split counties in the Senate and House to comply with the applicable one-person, one-vote standards and deny the remaining allegations of paragraph 41.**

42.     Alternative redistricting plans were proposed and/or available to the Legislature that would have provided for greater minority representation,

adhered more closely to past redistricting principles, and better followed the command of the Alabama Constitution.

**ANSWER: With respect to the allegations of paragraph 42, the Intervenors admit that alternative Senate and House redistricting plans were proposed for adoption in the 2012 Special Session and deny the remaining allegations.**

43.    In enacting the House and Senate plans, the Alabama Legislature departed from past practices in additional ways.  While the State held a series of public hearings on redistricting, the Legislature provided no information, not even maps of current districts at those hearings.  Minority citizens and others raised issues including over the county boundary rule and the artificially low deviation standard.

**ANSWER:    Denied.**

44.    The actual districts were drawn behind closed doors with white legislative leadership and other white members of the majority.  The process lacked the discussion and horse-trading that uniformly had marked previous state legislative redistricting.  The closest approaches to a substantive conversation with any member who had been supported by black voters appear to have been invitations to Democratic House Representative Joe Hubbard (District 73) and

Senator Marc Keahey (District 22) to change parties and to become Republications which would have been a prelude to substantive discussion. Both declined and their districts were gerrymandered as a result.

**ANSWER:   Denied.**

45.   Minority legislators repeatedly expressed concern and frustration at the exclusion from the redistricting process, but the Legislature ignored their complaints. The Redistricting Committee did not consider bills that had been introduced by black legislative members. The majority bill went to the floor where action followed a pattern that has dominated the Legislature since 2010 elections. Black members of the Legislature introduced their plans as substitutes. They and their allies talked for a while and then the all white majority voted "cloture" and passed their own bill without amendment.

**ANSWER:   With respect to the allegations of paragraph 45, the Intervenors admit that, during the July 2012 special session, some Democrats, including some African-American Democrats, offered substitute redistricting plans which were not adopted and deny the remaining allegations of paragraph 45**.

46.     The many intentionally discriminatory actions by the Legislature in adopting the House and Senate plans taken to minimize and cancel out minority voting strength include but are not limited to the following examples:

a.     The Legislature eliminated a nascent minority district (District 73) in Montgomery County.   During the course of the decade the white populations of the district had shrunk from nearly 70 percent of the total to only 44 percent of the total.   The district had swung to support black candidates and candidates favored by black voters, so that District 73 was a crossover district and was in the process of becoming an effective black majority district.   The Legislature abolished this predominantly minority district in Montgomery for the purpose of denying black and other minority voters an opportunity to maintain or to form coalitions and elect candidates of their choice, and to prevent the development of a majority black district in Montgomery.

b.     The 2010 census showed that it was possible to redraw District 73 as a district with a black voting age majority in a plan that did not split Montgomery County between districts.   Instead of recognizing legitimate minority political opportunities in Montgomery County, the Legislature packed the three black districts with excessive black majorities; retained and bolstered the existing white-controlled districts, including by splitting the county to import suburban

white population; and transferred District 73 to Shelby County, a rapidly growing white area, all with the invidious purpose of minimizing and cancelling out minority opportunities for political success, and with the effect of denying the right of black voters to elect a candidate of their choice.

c.     The 2010 census demonstrated that the boundaries of Jefferson did not need to be split for population equality purposes.  The county contained eight districts with black population majorities, seven of which were and are represented by black representatives.  The 2010 census showed that all eight districts could be maintained consistent with federal and state statutory and constitutional requirements.  Rather than recognize legitimate minority political opportunities, the Legislature eliminated one of the seven districts represented by a black representative with the invidious discriminatory intent to minimize and cancel out opportunities for minority political success, and with the result of denying the right of black voters of an equal opportunity to elect a candidate of their choice.

d.     The 2010 census demonstrated that the minority population in Madison County was concentrated so that minorities had the potential to predominate in a Senate district in a coalition district or a crossover district. Instead of drawing a district that realized this potential, the Legislature

exacerbated the existing fragmentation of the minority community so as intentionally to deny and cancel out minority voting strength and to thwart legitimate minority political opportunities.

e.      Prior to the 2012 redistricting, Senate District 22 was a crossover district.  District 22 contained substantial black and Native American populations, much of the latter historically having been concentrated in the Mount Vernon and McIntosh of Mobile and Washington Counties (MOWA Choctaw Band).  The State of Alabama subjected the MOWA Choctaw and other Native Americans to racial segregation and pervasive discrimination.  Black and Native American citizens of the area of former District 22 share many common governmental interests and vote cohesively.  The Legislature redrew Senate District 22 so as intentionally to disrupt and disenfranchise the effective coalition of black, Native American and other citizens who long had elected Senators of their choice from that area.  In doing so, the Legislature fragmented the MOWA Choctaw and other minority communities and avoided minority population concentrations so as to create a grotesque, oddly shaped district in which minority voters will not enjoy an opportunity to elect candidates of their choice. The Legislature redrew Senate District 22 so as to intentionally minimize and cancel out minority political opportunities.

f.     Prior to the 2012 redistricting, Senate District 11 was a crossover district.  The Legislature redrew Senate District 11 so as to disrupt and disenfranchise the effective coalition of black and other citizens who long had elected Senators of their choice form that area.  In doing so, the Legislature fragmented compact minority communities and avoided minority population concentrations so as to create another grotesque, oddly shaped district in which minority voters will not enjoy an opportunity to elect candidates of their choice. The Legislature redrew Senate District 11 so as to intentionally minimize and cancel out minority political opportunities.

**ANSWER:    Denied.**

## COUNT 1

## VOTING RIGHTS ACT

47.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

**ANSWER:  The   Intervenors   incorporate   their   responses   to   the allegations of paragraphs 1 through 46 as if fully set forth at this point of their Answer.**

48.    The proposed House and Senate plans set forth in Act No. 2012-602 and Act No. 2012-603 violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973,

in that each was adopted with a racially discriminatory purpose of minimizing and diluting the opportunities for minority voters to participate effectively in the political process, and to elect candidates of their choice to the Alabama Legislature; and that each plan would have the result of discriminating against minority voters on account of their race and membership in a language minority group and deny them an equal opportunity to elect candidates of their choice to the Alabama Legislature.

**ANSWER:   Denied.**

## COUNT II

## RACIAL GERRYMANDERING

49.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

**ANSWER:   The Intervenors incorporate their responses to the allegations of paragraphs 1 through 48 as if fully set forth at this point of their Answer.**

50.   Alabama Acts 2012-602 and 2012-603 were drawn for the purpose and effect of minimizing the opportunity of minority voters to participate effectively in the political process and for the purpose of capping African

American and other minority representation and influence in the Alabama House and Senate.

**ANSWER:   Denied.**

51.   The racial gerrymandering by Alabama Acts 2012-602 and 2012-603 violates the rights of Plaintiffs guaranteed to them by the Fourteenth and Fifteenth Amendments of the Constitution of the United States.   *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

**ANSWER:   Denied.**

## COUNT III

## 42 U.S.C. SECTION 1983 CLAIM

52.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set out herein.

**ANSWER:   The Intervenors incorporate their responses to the allegations of paragraphs 1 through 51 as if fully set forth at this point of their Answer.**

53.   Plaintiffs bring this action to redress violations of their constitutional and statutory rights under the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Constitution of the United States and enforce those rights pursuant to 42 U.S.C. Section 1983.

**ANSWER:   Denied.**

54.     These violations were conducted under color of state law, *i.e.,* Acts 2012-602 and 2012-603.

**ANSWER:   Denied.**

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request the following relief:

1.      That the Court take jurisdiction of this case;

2.      To cause a three judge panel to form to hear this case;

3.      To declare Acts 2012-602 and 2012-603 violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 and are unconstitutional as violating the Fourteenth and Fifteenth Amendment of the United States Constitution;

4.      To enjoin Defendants Governor Bentley and Chapman from enforcing the provisions of those Acts;

5.      To order and direct the Alabama Legislature to enact reapportionment laws for the state House and Senate that meet the requirements of Section 2 of the Voting Rights Act and the Fourteenth and Fifteen Amendment.  Should the Legislature fail in this endeavor, allow the parties to present to the Court proposed reapportionment districts for the Alabama House and Senate, or the Court devise a plan that meets stated requirements;

6.      Award costs and attorneys' fees, reasonable experts' fees and other reasonable expenses to Plaintiffs as provided by 42 U.S.C. 1973(1)(e) and 42 U.S.C. Section 1988;

7.      To provide other equitable, injunctive and declaratory relief necessary for this action.

**ANSWER:**   Denied.

<u>**AFFIRMATIVE DEFENSES**</u>

**First Defense**

The Court lacks jurisdiction to direct the Intervenors to follow state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103-23, 124-25 (1984); *Alabama Legislative Black Caucus v. Alabama,* no. 2:12-cv-691, doc. no. 53 (holding that '[t]o the extent that the complaint filed by the Black Caucus alleges that state officials violated state law, we lack subject-matter jurisdiction to consider it.").

**Second Defense**

The use of an overall range of population deviation of less than 2% in the 2012 Alabama House of Representatives and Senate redistricting plans does not violate constitutional one-person, one-vote standards.

**Third Defense**

The Reapportionment Committee's adoption of Guidelines for the redistricting process that, among other things, call for an overall range of population deviation of less than 2% for legislative redistricting plans was neither arbitrary nor impractical.

**Fourth Defense**

The Guidelines adopted by the Reapportionment Committee for the redistricting process that, among other things, call for an overall population range of less than 2% for legislative redistricting plans were not adopted with a racially discriminatory purpose.

**Fifth Defense**

There is no "whole county" provision in the Constitution of Alabama that applies to the Alabama House of Representatives.

**Sixth Defense**

The Constitution of 1901 assigns to the Legislature the duty of reconciling the portions of Ala. Const. (Recomp.) art. IX, § 200 which call for the districts in the Alabama Senate to be "as nearly equal to each other in the number of inhabitants as may be" and state that "[n]o county shall be divided between districts."

**Seventh Defense**

If reconciling the portions of Ala. Const. (Recomp.) art. IX, § 200 is not left to the Legislature, how to carry out that reconciliation represents an unsettled question of state law as to which Pullman abstention, certification to the Alabama Supreme Court, or both, are warranted.  *See Rice v. English*, 835 So. 2d 157, 174 (Ala. 2002) (See, J., dissenting).

**Eighth Defense**

The legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 do not violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

**Ninth Defense**

Plaintiff Weaver lacks standing and fails to state a claim as to which relief may be granted.

**Tenth Defense**

The Alabama Democratic Conference lacks associational standing, standing to pursue district-specific racial gerrymandering claims, or both.

**Eleventh Defense**

The legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 do not violate the First Amendment to the Constitution of the United States.

**Twelfth Defense**

The legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 do not violate the Fourteen Amendment to the Constitution of the United States.

**Thirteenth Defense**

The legislative redistricting plans adopted in Acts No. 2012-602 and 2012-603 do not violate the Fifteenth Amendment to the Constitution of the United States.

**Fourteenth Defense**

The legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 comply with Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and have been precleared.

**Fifteenth Defense**

Plaintiffs cannot overcome the presumption that the legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 were "the result of an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Daly v. Hunt*, 94 F.2d 1212, 1220 (4th Cir. 000) (*quoting Reynolds v. Sims*, 377 U.S. 533, 577, 84 S. Ct. 1362, 1390 (1963)).

**Sixteenth Defense**

Plaintiffs cannot show that the minor population deviations in the legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 "resulted solely from the promotion of an unconstitutional or irrational state policy." *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1286 (S.D. Ala. 2002) (three judge court).

**Seventeenth Defense**

Plaintiffs cannot show that any alleged "unconstitutional or irrational state policy is the actual reason" for the minor population deviations in the legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603. *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1286 (S.D. Ala. 2002) (three judge court).

**Eighteenth Defense**

Plaintiffs cannot show that the minor population deviations in the legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 were not caused by the promotion of legitimate state policies. *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1286 (S.D. Ala. 2002) (three judge court).

**Sixteenth Defense**

The creation of additional crossover or influence districts it not a valid remedy.

**Seventeenth Defense**

Any remedy that would favor the interests of African-American voters by diluting the votes in white majority districts would be as unlawful as a remedy that favored the interests of white voters by diluting the votes in black-majority districts.

**Eighteenth Defense**

Plaintiffs' claims of vote dilution are not cognizable under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

**Nineteenth Defense**

The 2012 legislative redistricting plans adopted in Acts Nos. 2012-602 and 2012-603 are not the produce of unconstitutional or unlawful racial gerrymandering.

**Twentieth Defense**

The creation of additional crossover, coalition, or influence districts is not a valid remedy.

**Twenty-First Defense**

The Intervenors had no duty under § 2 of the Voting Rights Act to preserve any crossover districts that may have existed under the previous plan.  *Bartlett v.*

*Strickland*, 556 U.S. 1, 19 (2009)(plurality op.)("[A]s a statutory matter, § 2 does not mandate creating or preserving crossover districts.").

### Twenty-Second Defense

Plaintiff Toussaint lacks standing and fails to state a claim as to which relief may be granted.

### Twenty-Third Defense

Any remedy that would favor the interests of African-American voters by diluting the votes in white majority districts would be as unlawful as a remedy that favored the white voters by diluting the votes in black-majority districts.

### Twenty-Fourth Defense

Plaintiffs' claims of vote dilution are not cognizable under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

### Twenty-Fifth Defense

If plaintiffs cannot devise a lawful remedy, they have no claim.  *Nipper v. Smith*, 39 F. 3d. 1494, 1533 (11th Cir. 1994) (*en banc*).

### Twenty-Sixth Defense

Plaintiffs' claims of partisan gerrymandering are nonjusticiable.

### Twenty-Seventh Defense

Plaintiffs' claims of partisan gerrymandering lack merit.

**Twenty-Eighth Defense**

Plaintiffs are not entitled to equitable relief because they have unclean hands.

**Twenty-Ninth Defense**

The balance of equities does not favor the plaintiffs, so equitable relief should not be awarded.

**Thirtieth Defense**

The equitable relief sought by the plaintiffs would not be in, and would disserve, the public interest.

**Thirty-First Defense**

Plaintiffs' claims against the State of Alabama are barred by the Eleventh Amendment and the State's sovereign immunity from suit.

**Thirty-Second Defense**

The Intervenors deny all allegations in the plaintiffs' complaint that is not expressly admitted above and demand strict proof thereof.

**Thirty-Third Defense**

Without conceding that the plans are in any way legally flawed, if this Court must draw a remedial plan (after having given the Alabama Legislature an opportunity to draw new plans), any court remedial plan must: (1) be an interim

plan; (2) be carefully tailored to the correction of any legal errors found by the Court; and (3) extend no further than necessary to correct such errors.

### Thirty-Fourth Defense

Plaintiffs are not entitled to an attorneys' fee, and the Intervenors reserve the right to contest any amount requested.

### Thirty-Fifth Defense

In *Alabama Legislative Black Caucus v. Alabama*, no. 2:12-cv-691, with which this case is consolidated, the three-judge-court entered a judgment on the pleadings against the plaintiffs' Count I, which alleged that use of the ±1% deviation standard violated their one person, one vote right. Id., doc. 53 at 9 (The population deviation in both sets of the districts is de minimis and the complaint filed by the Black Caucus fails to allege any facts that would rebut the presumption that those districts satisfy the guarantee of one-person, one-vote under the Fourteenth Amendment.) Plaintiffs in this case likewise have failed to allege facts that would rebut the presumption that the challenged districts satisfy the guarantee of one-person, one-vote under the Fourteenth Amendment.

Respectfully submitted this 27th day of March, 2013.


*/s/ Dorman Walker*
One of counsel for Intervenors

OF COUNSEL:
Dorman Walker (ASB-9154-R81J)
Balch & Bingham LLP
Post Office Box 78
Montgomery, AL  36101
334/834-6500
334/269-3115 (fax)


## CERTIFICATE OF SERVICE

I certify that on March 27, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

John J. Park, Jr.
Strickland Brockington Lewis LLP
Midtown Proscenium, Suite 2200
Atlanta, GA  30309

James W. Davis
Misty S. Fairbanks Messick
Attorney General's Office
Post Office Box 300152
Montgomery, AL  36130-0152

James H. Anderson
Jesse K. Anderson
William F. Patty
Beers Anderson Jackson Patty & Fawal, P.C.
Post Office Box 1988
Montgomery, AL  36102

226823.1

Joe M. Reed
Joe M. Reed & Associates, LLC
524 South Union Street
Montgomery, AL  36104

John K. Tanner
3743 Military Road, NW
Washington, DC  20015

Walter S. Turner
Post Office Box 6142
Montgomery, AL  36106

James U. Blacksher
Post Office Box 636
Birmingham, AL  35201

Edward Still
130 Wildwood Parkway, Suite 108
PMB 304
Birmingham, AL  35209

U.W. Clemon
White Arnold & Dowd, P.C.
2025 Third Avenue North, Suite 500
Birmingham, AL  35203

_/s/ Dorman Walker_ _____
Of Counsel